MAIER BREWING COMPANY, A CALIFORNIA CORPORATION, NOW KNOWN AS S & P COMPANY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Maier Brewing Co. v. Commissioner
Docket Nos. 8609-72; 6937-82; 7163-82.
United States Tax Court
T.C. Memo 1987-385; 1987 Tax Ct. Memo LEXIS 383; 54 T.C.M. (CCH) 46; T.C.M. (RIA) 87385; August 5, 1987. *383 P and its subsidiaries were corporations involved in the beer industry and in the commercial and residential real estate business. Held:
(1) P is not entitled to relief under section 1341, I.R.C. 1954, because it did not include in its gross income an item for which it could later claim a deduction; (2) P correctly estimated the useful life of the May Company building, and depreciation deductions are reduced as of the taxable year 1969 rather than the taxable year 1968; (3) P is not entitled to depreciation deductions for the plant or equipment at the Falstaff brewery; (4) No deduction is allowed for obsolescence of the Lucky Lager plant, but a deduction is allowed for obsolescence of the Maier Brewery plant; (5) The deduction for extraordinary obsolescence of the Walter Brewing plant is disallowed; (6) P's additions to its bad reserve were not reasonable; (7) The deduction for the cost of moving brewery equipment is disallowed; (8) No deductions are allowed for accrued interest and property taxes for the Martinique East Apartments, but P is entitled to depreciation deductions for the property, and the income from discharge of indebtedness when P was released from liability for the *384 interest and property taxes is not included in P's gross income in 1966; (9) The cost of repairs to the Lucky Lady yacht must be capitalized, and the depreciation deduction for the Lucky Lady is disallowed; (10) The charitable deduction for the Regal Pale land is disallowed; (11) P incorrectly computed the depreciation deduction for the Studio Village Shopping Center; (12) P incorrectly computed the depreciation deduction of the Costa Mesa Apartment complex; (13) The basis in the Regal Pale machinery and equipment is increased for purposes of depreciation and for purposes of recognition of gain upon the sale thereof; (14) P incorrectly computed depreciation of the Regal Pale brewery buildings; (15) The deduction for the Regal Pale organization expense is disallowed; (16) P used an incorrect useful life for depreciation purposes for the Vernon Street building; (17) The deductions for abandonment of assets of the Lucky Lady brewery and Vancouver plant are disallowed; and (18) Deductions for salaries and other expenses incurred in connection with the acquisition of Falstaff stock are disallowed. William M. Bitting, Vincent C. Page and Jack R. White, for the petitioners. Thomas F. Kelly, *385 for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in income tax for the following petitioners for the following years: Year
Petitioner
Docket No.
Ended
Deficiency
Maier Brewing Company
8609-72
6/30/63
$ 16,305.56   6/30/64
613,838.77
6/30/65
220,069.91
6/30/66
153,750.20
6/30/68
86,626.84
6/30/69
174,785.00
[2] S & P Company 6937-82
6/30/74
856,568.00
6/30/75
997,820.00
6/30/76
1,602.117.00
[3] Paul Kalmanovitz 7163-82
12/31/75
5,300.00
and Lydia Kalmanovitz
12/31/76
30,543.00
After concessions, the issues for decision [4] are: (1) Whether petitioner is entitled to relief under section 1341; [5]
(2) Whether petitioner correctly computed the depreciation deductions for the May Company building; (3) Whether petitioner is entitled to depreciation deductions for the plant and equipment *386 at the Falstaff Brewery; (4) Whether petitioner suffered obsolescence losses at the Maier Brewing plant in Los Angeles and at the Lucky Lager plant in San Francisco in the taxable year 1974; (5) Whether petitioner is entitled to the deduction claimed for Walter Brewing Company depreciation by reason of extraordinary obsolescence; (6) Whether petitioner's additions to its bad debt reserve were reasonable; (7) Whether the cost of moving brewery tanks from Oakland, California, to Los Angeles, California, was a deduction business expense; (8) Whether petitioner is entitled to deductions for accrued expenses in the Martinique East Apartments; (9) Whether petitioner may deduct the cost of repairs or depreciation for the yacht "Lucky Lady;" (10) Whether petitioner is entitled to a charitable contribution deduction for the Regal Pale land; (11) Whether petitioner properly calculated the depreciation expense for the Studio Village Shopping Center; (12) Whether petitioner used a proper method of depreciation for the Costa Mesa Apartment complex; (13) Whether respondent correctly determined the basis of the Regal Pale machinery and equipment for purposes of recognition of gain upon the sale *387 thereof; (14) Whether petitioner properly claimed depreciation expense for the Regal Pale Brewery buildings for the taxable year 1968; (15) Whether petitioner may claim a deduction for the Regal Pale organization expense in 1969 or 1974; (16) Whether petitioner used the appropriate useful life for the Vernon Street building for depreciation purposes; (17) Whether petitioner is entitled to abandonment losses for assets of the Lucky Lager brewery and the Vancouver plant for the taxable year 1974; and (18) Whether petitioner is entitled to deductions for salaries and other expenses made in connection with the acquisition of Falstaff stock. GENERAL BACKGROUND
Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. [6] *388 *389 Petitioner S & P Company (formerly Maier Brewing Company) was a California corporation whose principal office was located in California at the time the petitions in these cases were filed. S & P changed its name several times from its date of incorporation until the time of trial. Hereinafter, S & P Company will be referred to as petitioner or Maier for the taxable years 1963 through 1969 and petitioner or S & P for the taxable years 1974 through 1976. For each of its taxable years 1963 through 1969 and 1974 through 1976, petitioner was an accrual basis taxpayer. During the years in issue, Paul Kalmanovitz was president and owner of petitioner. Paul Kalmanovitz was involved in the commercial and residential real estate business for approximately 50 years acting directly or indirectly as owner, lessor and lessee of numerous shopping centers, ranches, restaurants, residential apartment complexes and other real property in California and other states. Kalmanovitz was also involved in the beer industry in the United States and was the owner, president and chief operating *390 officer of a number of American breweries. During the years in issue, Kalmanovitz directly or indirectly controlled and personally directed the following companies (whose names have changed on several occasions as follows): (A) S & P Period
Company Name
Prior to October, 1958
S & P Company
October, 1958 - November, 1971
Maier Brewing Company
November, 1971 - January, 1972
General Brewing Company
1/24/72 to 7/19/72
Maier Brewing Company
7/19/72 to 1/17/73
S & P Company
1/17/73 to 2/5/74
General Brewing Company
2/5/74 until trial
S & P Company
(B) Keller Street Development Company (hereinafter referred to as Keller): Period
Company Name
Prior to 10/17/58
Maier Brewing Company
10/17/58 until trial
Keller Street Development
Company  For convenience, our remaining findings of fact and opinion will be combined by issue. Issue 1: Section 1341
Maier Brewing Company, Keller Street Development Company and Paul Kalmanovitz are the same entities and person that were involved in Keller Street Development Co. v. Commissioner,T.C. Memo. 1978-350, affd. 688 F.2d 675 (9th Cir. 1982). [7] The parties have stipulated the facts found by this Court in Keller Street. Accordingly, we incorporate those facts herein and will *391 repeat them only to the extent necessary to explain the issues now before us. Keller Street Development Company (hereinafter referred to as Keller) was a successor corporation to Maier. Maier was in the brewery business until it sold its assets to S & P on October 17, 1958. S & P then changed its name to Maier, and the former Maier became Keller. Keller was experiencing serious financial difficulties when Kalmanovitz became its president. Kalmanovitz and his spouse owned or controlled, through a charitable foundation and a wholly-owned corporation, approximately 70 percent of Keller's outstanding stock. Keller's minority shareholders expressed a desire to sell the brewery, and the board of *392 directors passed a resolution authorizing Kalmanovitz to negotiate the sale of Keller's assets with anyone "on the most favorable price and terms attainable." On June 28, 1958, Maier, then known as S & P (a corporation wholly owned by Kalmanovitz and his spouse), submitted a written offer to purchase Keller's brewery business. The offered purchase price was $ 7,708,605.25, [8] of which $ 6,000,000 was to be paid for the brewery assets, other than inventory and accounts receivable, and $ 1,708,605.25 was to be paid for the book value of the inventory and the face value of the accounts receivable (reduced by a five-percent reserve). This offer was approved by a majority of the shareholders on June 28, 1958. The terms for payment under the sale provided that all cash payments were to be made to Keller, thereby precluding any portion of the sale price from going to the minority shareholders. The minority shareholders objected to the terms of the sale and brought an action for rescission in the California Superior Court for *393 the County of Los Angeles. Named as defendants in the action were Kalmanovitz, Keller and Maier. The Superior Court held for the defendants, and the minority shareholders appealed. The California Court of Appeals reversed and remanded the decision to the Superior Court. After a second trial on remand, the Superior Court concluded that the terms of payment under the purchase and sale agreement were not just and reasonable and were unfair to Keller. The Superior Court also decreed that certain real and personal property acquired by Maier after the transaction with Keller were held by Maier as a constructive trustee for Keller. The defendants appealed. The California Court of Appeals again reversed the decision of the Superior Court, holding that a constructive trust was improper unless the assets acquired by Maier after the transaction could be traced to the income generated by the assets purchased from Keller. The appellate court also held that if any of the assets impressed with a constructive trust by the Superior Court could not be traced to the income generated by the assets acquired from Keller, a money judgment would be the only remedy available to the plaintiffs. The *394 appellate court again remanded the case to the Superior Court. At the final trial in the Superior Court, the parties attempted to trace the profits earned by Maier to the brewery assets it acquired from Keller. After the tracing proved futile, the parties finally agreed to settle the case. The terms of the settlement agreement provided that the defendants would purchase the minority shares at $ 55 per share in addition to the payment of $ 500,000 in attorney fees. On June 3, 1968, the Superior Court ordered a rescission of the purchase and issued findings of fact and conclusions of law incorporating the terms of the settlement. The Superior Court found that the earnings and profits generated by Maier from the use of the brewery assets acquired from Keller could not be established or traced into specific assets acquired by Maier after the acquisition of the assets from Keller and that in lieu of specific profits from the brewery assets, Keller was entitled to a reasonable amount computed by using "solely as a measure of said product or profit" interest on the fair market value of the transferred assets as of June 29, 1958. The Superior Court held that it was impossible to determine *395 the product or profit realized by Maier from the use of the transferred brewery assets or to trace the product or profit into any specific assets or fund acquired by Maier after it acquired Keller's assets. The Superior Court determined that $ 2,432,175.45 was a reasonable amount of compensation for the use of Keller's brewery assets and ordered Maier to pay Keller that amount as a substitute for the product or profit realized by Maier from the use of the transferred brewery assets. Under the Superior Court's final judgment, the 1958 purchase and sale were rescinded, and in lieu of the monetary rights and obligations under the original purchase and sale agreement, Maier was ordered to pay an aggregate amount of $ 10,858,368.94, comprised of the following: Brewery assets (including the original
assets sold plus the bottle house built subsequent to the 1958 transaction) $ 6,300,000.00
Additional sum as a substitute for product
or profit 2,432,175.45
Rent on bottle house
365,000.00
Accounts receivable and inventory
1,761,193.49
In Keller Street Development Co. v. Commissioner,T.C. Memo. 1978-350, this Court held that the payment of $ 2,432,175.45 should be treated as ordinary income to Keller *396 because it represented payment received for the use of Keller's assets and as a substitute for the product or profit derived therefrom. The Ninth Circuit affirmed the opinion of this Court, but disagreed with our analysis, concluding that the $ 2,432,175.45 award should be treated as ordinary income because it was analogous either to interest paid to a seller to compensate for delay in the payment of a purchase price or to rent paid for the temporary use of income-producing property. Keller Street Development Co. v. Commissioner,688 F.2d 675, 682 (9th Cir. 1982). Petitioner maintains that it is entitled to the relief provided by section 1341 for the $ 2,432,175.45 it paid to Keller in compliance with the June 3, 1968, judgment of the California Superior Court. Respondent takes the position that section 1341 does not apply in this case, but that the award is deductible as a business expense under section 162. Section 1341 [9] *398 *399 *400 *401 provides relief to a taxpayer who in an earlier tax year includes in gross income an item of income received under a claim of right and in a later tax year is required to repay that amount. The claim of right rule was first announced in North American Oil v. Burnet,286 U.S. 417 (1932). *397 In that case the Supreme Court held that income received under a claim of right and without restriction as to its disposition is taxable in the year of receipt even though the taxpayer may claim that he is not entitled to retain the income and, in fact, may be adjudged liable to restore it in a later year. In United States v. Lewis,340 U.S. 590 (1951), the taxpayer had included in income on his 1944 return an employee's bonus that had been improperly computed. Under a state court's judgment, he was compelled to return approximately $ 11,000 to his employer in 1946. The Supreme Court refused to reopen the taxpayer's 1944 return and held that the repayment could not be accounted for, for tax purposes, as a reduction of income in the year of receipt. After United States v. Lewis, the adjustment to income, if any adjustment could be allowed, could be allowed only as a deduction in the year of repayment as suggested by the Supreme Court in dicta in North American Oil v. Burnet,286 U.S. at 424. In 1954, Congress enacted section 1341 in response to United States v. Lewis, H. Rept. No. 1337, 83d Cong., 2d Sess., A294 (1954). Section 1341 applies if (1) an item was included in gross income for a prior taxable year because it appeared that the taxpayer had an unrestricted right to the item; (2) a deduction *402 is allowable for the current taxable year because it was established after the prior year that the taxpayer did not have an unrestricted right to the item or a portion thereof; and (3) the deduction exceeds $ 3,000. Section 1341(a).
If all the conditions of section 1341(a) are met, the tax liability for the repayment year is the lessor of (1) the tax for the repayment year computed with a deduction for the amount of the repayment, section 1341(a)(4), or (2) the tax for the repayment year without the deduction minus the tax that would have been saved in the prior year or years if the repaid amount had been excluded. Section 1341(a)(5). If the allowable deduction is attributable to income reported in more than one earlier year, but the amount of the income cannot readily be identified, the deduction is apportioned among the earlier years in proportion to the income in each year. Section 1.1341-1(d)(3), Income Tax Regs.Section 1341 is to be applied separately to each year, and at least one court has permitted a taxpayer to claim the alternative tax relief under section 1341(a)(5) for one year and the simple deduction under section 1341(a)(4) with respect to others. Missouri Pacific Railroad Co. v. United States,423 F.2d 727 (Ct. Cl. 1970), *403 cert. denied 402 U.S. 944 (1971). Petitioner argues that it is entitled to claim the alternative tax relief under section 1341(a) separately for each of the years from 1958 until 1968 with respect to the $ 2,432,175.45 paid to Keller. We hold that petitioner is not entitled to relief under section 1341 because the $ 2,432,175.45 was not an item of income for purposes of section 1341(a)(1). Petitioner maintains that the $ 2,432,175.45 award represents the product or profit generated by the Keller assets. Petitioner contends that it included in gross income the product or profit generated by the Keller assets during the years 1958 through 1967 and therefore should be entitled to relief under section 1341 because it had to repay that amount in 1968. Petitioner's characterization of the $ 2,432,175.45 award is incorrect. The California Supreme Court held that it was impossible to determine the product or profit realized by Maier from the use of Keller's brewery assets. Therefore, under the judgment of the California Court of Appeals, a constructive trust was improper, and the $ 2,432,175.45 was a money judgment awarded as compensation for the use of Keller's assets. The manner in *404 which the amount was determined, i.e., by applying an interest rate to the value of the assets, is consistent with that explanation. The Ninth Circuit has concluded that the award was not for the profit or product generated by the Keller assets, but was akin to interest or rent. Under the rule established in Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we are bound by the decision of the Ninth Circuit on this issue. Accordingly, the award paid to Keller does not represent an item that petitioner had previously included in its gross income. Because it was akin to interest or rent, the $ 2,432,175.45 paid to Keller was an ordinary and necessary business expense deductible under section 162. Petitioner relies on the example illustrating section 1.1341-1(h), Income Tax Regs., which states in part: A sold his personal residence to B in a prior taxable year and realized a capital gain on the sale. C claimed that under an agreement with A he was entitled to a 5-percent share of the purchase price since he brought the parties together and was instrumental in closing the sale. A rejected C's demand and included the *405 entire amount of the capital gain in gross income for the year of sale. C instituted action and in the taxable year judgment is rendered against A who pays C the amount involved. * * * Section 1341 applies to the payment of the 5-percent share of the purchase price to C. * * * Petitioner contends that this example is analogous to the instant case. We disagree. The example concerns the applicability of section 1341 to the commission paid to a broker for the sale of property. It is well established that such commissions and other selling expenses are offset against the price of the property in determining the amount realized on the sale of real estate. Griffin v. Commissioner,19 B.T.A. 1243 (1930). Gains derived from dealing in property are included in gross income. Section 61(a)(3). Therefore, C's share of the purchase price was an item that A had included in gross income for a prior taxable year that he was required to repay in a later taxable year, and section 1341 applies to A's payment to C. In the instant case, Maier's payment to Keller has been characterized as an interest payment or rental payment, neither of which were items included in Maier's gross income. Accordingly, *406 section 1341 does not apply to the payment at issue in this case. Petitioner's reliance on Killeen v. United States, an unreported case ( S.D.Cal. 1963, 63-1 USTC par. 9351, 11 AFTR 2d 1072), is also misplaced. In Killeen, a joint venture agreement between a manufacturer and a designer to produce and market a new device provided that the net profits would be divided equally between the two parties. The designer later obtained a judgment in state court that a portion of the profits had been withheld wrongfully. The manufacturer satisfied the judgment by paying the disputed amount to he designer and then claimed a refund under section 1341. The district court held that the profits paid in satisfaction of the state court judgment had been included as an item of the taxpayer's gross income. In Killeen, there was no question that the amounts paid in satisfaction of the judgment were profits and therefore an item included in the taxpayer's gross income under section 61(a)(2). In the instant case it was impossible to determine what profits were generated by the Keller assets. Maier was therefore required to compensate Keller for the use of its assets from 1958 until 1968. Because *407 the payment was more like interest or rent, it was not an item included in Maier's gross income during the years 1958 through 1967, and section 1341 does not apply. [10]
Issue 2: The May Company Building
Petitioner owned the El Rancho Shopping Center in Arcadia, California. On May 3, 1965, petitioner entered into a written lease agreement with the May Department Stores Company (hereinafter referred to as the May Company). Under the terms of the lease, the May Company agreed to pay petitioner a ground rent of $ 100,000 per year for a term of 99 years, and petitioner agreed to construct a store building, other buildings and a parking facility for the May Company according to specifications. The store building that petitioner build was a concrete and steel structure, leased to the May Company for 30 years. The construction was financed by loans from the May Company. The rental payments for the 30-year building lease term equalled the amount *408 of the amortization of the loan. Under the terms of the agreement, the May Company had the right to raze and remove all or any portion of the leased improvements at any time during the lease terms. The May Company also had an option to purchase the improvements after 20 years. The option had not been exercised. The May Company building is situated at the back of the El Rancho Shopping Center and is barely visible from Huntington Drive, the main boulevard that borders the center. At the time of trial, one of the three floors of the May Company building was vacant. The May Company was unsuccessful in finding a tenant to sublease the space. In the early 1980s, petitioner spent approximately $ 3,600,000 remodeling the El Rancho Shopping Center. Although there were numerous vacancies in other buildings in the center, one portion of a building in the shopping center had been leased to a restaurant at the time of trial. a. Useful Life
Section 167[11] *410 allows a depreciation deduction for the exhaustion, wear and tear, including a reasonable allowance for obsolescence, or property used in a trade or business or held for the production of income. The amount of depreciation allowable *409 is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan so that the aggregate amounts set aside, plus the salvage value, will at the end of the estimated useful life of the depreciable property, equal the basis of the property. Section 1.167(a)-1(a), Income Tax Regs. In the taxable year 1967, petitioner began claiming depreciation deductions for the May Company building based on a useful life of 20 years. Respondent takes the position that the useful life of the May Company building is 45 years. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Useful life is defined in section 1.167(a)-1(b), Income Tax Regs., which provides: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) *411 wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * *
See also Massey Motors, Inc. v. United States,364 U.S. 92, 98 (1960) (the useful life of an asset is the period over which it will be useful to a taxpayer in his trade or business). Section 1.167(a)-9, Income Tax Regs., provides: § 1.167(a)-9. Obsolescence. The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the *412 industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. * * * A determination of useful life, whether grounded in physical deterioration or in obsolescence, is one of fact. Zimmerman v. Commissioner,67 T.C. 94, 106 (1976). Petitioner contends that the shortened useful life is justified because the building will be useful economically for only 20 years. This economic obsolescence is a permissible consideration. Section 1.167(a)-9, Income Tax Regs.; Zimmerman v. Commissioner,67 T.C. 94, 106 (1976). However, petitioner must establish the probability of such normal obsolescence with reasonable certainty. See Dunn v. Commissioner,42 T.C. 490, 494 (1964). Because economic obsolescence is defined in terms of usefulness to the taxpayer, petitioner must establish with reasonable certainty that the May Company building will have little or no value at the end of the useful life selected. See Zimmerman v. Commissioner, supra at 107. To meet its burden of proof, petitioner introduced the testimony of an expert witness experienced in conducting retail feasibility studies for government and private industry. The expert's testimony *413 focused on two reports he had prepared for petitioner involving an economic life analysis of the May Company building. The expert concluded that, based upon marketing and financial analyses, the May Company building would be economically and financially obsolete as early as 12 to 5 years from the date of its opening. Respondent offered no expert witnesses on his own but attacked the credibility of the reports and the expert's testimony. We have held that the testimony of an expert witness need not be accepted at face value. Fort Walton Square, Inc. v. Commissioner,54 T.C. 653, 656 (1970). Moreover, an expert's opinion is entitled to substantial weight only if it is supported by the evidence. Casey v. Commissioner,38 T.C. 357, 381 (1962). See Hill v. Commissioner,63 T.C. 225, 250-251 (1974), affd. sub nom. Tenner v. Commissioner,551 F.2d 313 (9th Cir. 1977).
Respondent argues that the witness's opinion of the useful life was based on economic obsolescence caused by competition from other department stores in the area, a factor that cannot be used in determining obsolescence. We find, however, that the witness's opinion is not based upon competition alone but is based upon a *414 variety of factors. We considered, inter alia, the location of the building, the anticipated growth in trade area sales potential and the effect of overbuilding of the department store market. Such considerations merit substantial weight and assist us in our determination of useful life in this case. Graves v. Commissioner,48 T.C. 7, 14 (1967), affd. per curiam 400 F.2d 528 (9th Cir. 1968). Respondent attacks the expert's reports as hindsight evidence which may not be used in depreciation cases. However, the reports were drafted in 1975, one of the years in issue in this case, and the factors upon which the expert's conclusions were based existed from the beginning of the May Company's existence or came into being shortly thereafter and were reasonably foreseeable at the outset. See section 1.167(b)-0(a), Income Tax Regs. (the reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made). Respondent also attacks the testimony of Paul Kalmanovitz, petitioner's president, on this issue. The parties have stipulated that Kalmanovitz had been involved in the real estate business *415 for 50 years, and, therefore, his opinion concerning the useful life of the building is relevant. The testimony of those who are personally familiar with an asset and are qualified to give an expert opinion about its approximate useful life is relevant to the determination of the useful life of that asset. Casey v. Commissioner,38 T.C. 357, 381 (1962). A petitioner may testify, based upon his knowledge of the business and familiarity with the particular asset, to support his determination of the asset's useful life. Respondent's regulations anticipate the relevance of Kalmanovitz's testimony. Section 1.167(a)-1(b), Income Tax Regs., provides in part: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * * [Emphasis supplied.] Respondent contends that Kalmanovitz's testimony offers *416 no factual analysis and no basis to make a determination of the estimated useful life of the building. Kalmanovitz testified that he based his determination on such factors as the location of the building, the lack of good will of the community toward the erection of the building and his experience with shopping centers in southern California. Kalmanovitz's testimony, combined with the testimony of petitioner's expert witness, supports a finding that the useful life of the May Company building was 20 years. Respondent contends that the existence of a 30-year lease on the May Company building establishes that the useful life of the building is at least 30 years. We disagree.
A lessor normally is required to depreciate property over its useful life without regard to the period of the lease. Section 1.167(a)-4, Income Tax Regs.
We hold that petitioner correctly estimated the useful life of the May Company building. b. Basis
At the same time that petitioner and the May Company signed the lease for the May Company building, petitioner executed a promissory note payable to the May Company and secured by a first deed of trust encumbering the property. The principal amount of the promissory *417 note was an estimated amount of the cost of constructing the building. The lease agreement provided that soon after the completion of the construction or after the rent commencement date, the May Company was to determine the actual cost of construction, and that if the actual cost of construction differed from the estimated amount of the loan, the promissory note would be adjusted accordingly. The agreement also provided that if the actual cost were less than the estimated amount of the loan, then at the time of the determination the difference between the cost of construction and the estimated amount of the loan would be credited as paid on the principal of the original promissory note. By letter dated April 26, 1968, the May Company advised petitioner that the sum of $ 875,861.04 would be credited as paid principal on petitioner's promissory note as of July 1, 1968. This credit represented the difference between the estimated amount of the note and the aggregate amount of the May Company's advances to petitioner. The contract adjustment reduced the amount of petitioner's payments on the notes beginning July 1, 1968. [12] *418 Respondent takes the position that the $ 875,861.04 credit on petitioner's promissory note reduced petitioner's basis for depreciation in the taxable year 1968 rather than in the taxable year 1969. We disagree. The readjustment of the amount of the promissory note in this case resulted in a reduction of the original purchase price of the building. The reduction of the original purchase did not constitute a discharge of indebtedness under section 61(a)(12), as urged by respondent, but was a transaction that procured a decrease in petitioner's capital investment and reduced the basis of the building. Commissioner v. Sherman,135 F.2d 68 (6th Cir. 1943), affg. 44 B.T.A. 853 (1941); Helvering v. A. L. Killian Co.,128 F.2d 433 (8th Cir. 1942); Gehring Publishing Co. v. Commissioner,1 T.C. 345 (1942). Although the parties agree that the readjustment of the amount of the promissory note resulted in a reduction *419 of petitioner's basis, they disagree as to when the reduction of the basis occurred. The depreciation for the 1967 taxable year remains unaffected by the reduction of the original purchase price in a later year. Blackstone Theatre Co. v. Commissioner,12 T.C. 801 (1949). Petitioner argues that its depreciation deductions should not be reduced until July 1, 1968, because the letter dated April 28, 1968, recites that petitioner's credit was to be applied as of July 1, 1968. Respondent maintains that petitioner's basis in the building was reduced at the time that the actual cost was determined, and therefore its depreciation deductions must be reduced in the taxable year ended June 30, 1968. Petitioner's debt to the May Company was not reduced until its account was credited on July 1, 1968, on which date the purchase price of the building was reduced. Therefore, the amount of petitioner's depreciation deduction is reduced as of July 1, 1968. Issue 3: Depreciation of the Falstaff Brewery
On October 7, 1974, Falstaff Brewing of St. Louis, Missouri, agreed to sell its brewery plant at 410 Tenth Street, San Francisco, California, to General Brewing Company, one of petitioner's subsidiaries *420 (hereinafter referred to as General), for $ 3,000,000. The sale took place December 20, 1974. On March 10, 1975, S & P acquired a controlling interest in Falstaff Brewing Company with the purchase of voting preferred stock in the amount of $ 4,603,000. The $ 3,000,000 price for the Falstaff Brewery in San Francisco represented the book value on Falstaff's books. General paid $ 500,000 in cash and the balance in the form of a promissory note secured by a mortgage on the property. Respondent disallowed all the deductions taken for depreciation of the San Francisco brewery purchased from Falstaff. Section 167 provides a depreciation deduction for (1) property used in the trade or business, or (2) property held for the production of income. It is respondent's position that the Falstaff brewery was not used in a trade or business or for the production of income. The weight of the evidence supports respondent's position. In connection with the purchase of the Falstaff brewery, General and Falstaff entered into a production agreement providing that General was to produce beer and ale for Falstaff under Falstaff's brand names, in quantities to be ordered by Falstaff. Carl Mullen, *421 who had been General's executive vice president, and Kalmanovitz, who had been chairman of the board of directors of General when the production agreement was signed, both testified that the president and plant manager of Falstaff had indicated that Falstaff would require General to produce 400,000 barrels of beer and ale per year under the production agreement. Kalmanovitz testified that General's Lucky Lager plant in San Francisco could not have produced the extra 400,000 barrels a year and that he bought the Falstaff brewery to meet this requirement. We find it difficult to believe this testimony. There is no written document confirming the 400,000 barrel projection. The actual number of barrels produced and sold under the Falstaff production agreement was as follows: Date
No. of Barrels
10/74-12/74
4,461
1975
177,720
1976
325,173
1977
226,904
[13] 1978 166,990
1979
105,493
1980
83,456
1981
57,102
1982
50,778
1983
31,309
1984
22,898
1/85 - 8/85
12,319
The production agreement and the *422 minutes of the Falstaff Brewing Company state that the production of the Falstaff beer and ale was to take place either at General's Lucky Lager plant in San Francisco or General's Lucky Lager plant in Vancouver, Washington. No mention is made of the Falstaff plant in San Francisco. General never produced beer or ale at the Falstaff plant. Shortly after purchasing the plant, General began to demolish portions of the building. The office building continued to be used until 1978. Respondent has allowed a depreciation deduction for the use of the office. Falstaff ceased its brewing, bottling and racking operations before December, 1974. In compliance with the requirements of the Bureau of Alcohol, Tobacco and Firearms (hereinafter referred to as BATF), in March 1973, Falsatff filed a "Brewer's Notice," Form 27-C, advising BATF that it intended to discontinue business at its San Francisco plant. BATF assigned an inspector to assist in the closeout of Falstaff's operations at the San Francisco brewery and to ascertain that proper beer taxes had been paid. The inspector testified that when he visited the plant in December, 1974, and again in January and February, 1975, no production *423 of beer was taking place. The employees of the Falstaff plant told the inspector that the brewery would be closed permanently. At the time of the inspection, some of the brewery equipment had been removed from the plant and holes had been cut into the walls making the building insecure for beer production. Had General intended to produce beer at the San Francisco Falstaff plant, it would never had been required to file a Brewer's Notice with BATF. No such notice was ever filed, and no one has operated a brewery at the site since Falstaff ceased production. Petitioner's own expert witness testified that the Falstaff plant in San Francisco was old and inefficient and could not compete with other breweries. In his opinion the Falstaff plant was obsolete at the time it was purchased by General. Upon consideration of all the evidence, we conclude that petitioner did not intend to operate the Falstaff brewery and did not acquire it for use in its trade or business. Accordingly, no depreciation is allowable for the brewery assets. As stated, the Falstaff brewery was never used in petitioner's business. Petitioner argues that property need not actually be used in a trade or business *424 or for the production of income to qualify for depreciation. All the cases upon which petitioner relies, however, require that to qualify for depreciation the property must be devoted to the trade or business. Property "devoted to the trade or business" is property that was once used in the business and has not been shown to have been withdrawn from business purposes. Kittredge v. Commissioner,88 F.2d 632, 634 (2d Cir. 1937); affg. 34 B.T.A. 1314 (1936). See also Twentieth Century-Fox Film Corp. v. Commissioner,45 T.C. 137, 143 (1965), affd. 372 F.2d 281 (2d Cir. 1967); Wilson Line, Inc. v. Commissioner,8 T.C. 394, 400 (1947); P. Dougherty Co. v. Commissioner,5 T.C. 791, 795 (1945), affd. 159 F.2d 269 (4th Cir. 1946); Yellow Cab Co. of Pittsburgh v. Driscoll,24 F.Supp. 993 (W.D. Pa. 1938). See also Tarutis v. Commissioner,T.C. Memo. 1982-313; Lenington v. Commissioner,T.C. Memo. 1966-264; Kent v. Commissioner, a Memorandum Opinion of this Court dated Dec. 31, 1953 (23 P-H Memo T.C. par. 54,011 at 54-57, 12 T.C.M. 1491, 1499). In this case Falstaff withdrew the brewery from business use. General never used the brewery in its trade or business, nor did it devote the brewery *425 to its business by filing a Brewer's Notice with BATF or operating the plant. Because we have found that petitioner did not intend to use the Falstaff brewery in its trade or business, the brewery was not devoted to trade or business and cannot be depreciated under section 167. [14]
Issue 4: Obsolescence Losses at the Maier Brewing Plant in Los Angeles and the Lucky Lager Plant in San Francisco
During the taxable year 1974, petitioner ceased operations at the Maier Brewing plant in Los Angeles. Beer production at the plant had stopped in the latter part of 1973. On its return for the taxable year ended June 30, 1974, petitioner claimed an obsolescence loss of $ 528,281, which represented one-third of the remaining basis of the brewery assets, less salvage value as of June 30, 1974. All the assets were placed together in one account that included buildings and plant, machinery and equipment, *426 and automotive equipment. In the taxable year ended June 30, 1974, these assets were depreciated just over 20 percent of the unadjusted basis. Petitioner did not claim additional obsolescence losses in succeeding years. The Maier Brewing plant has been idle since 1974, but the assets remain on the premises. The property is currently held for sale. The Maier plant comprises 40 acres and two parcels separated by the Santa Ana Freeway in downtown Los Angeles near Union Station. It includes the brewery, offices, warehouses and loading docks and is available for sale. Since the Maier Brewing plant ceased operations in 1974, no one has made an offer to buy the brewery to produce beer. The Maier Brewing plant is bisected by the Santa Ana Freeway. It is not possible to remove the buildings or equipment without closing the freeway. The plant was built in 1875. Temperature shrinks and expands the building. Bricks can be pulled out of the wall by hand. The Maier Brewing plant is run down and could not compete with new breweries. It is not economically usable. The Maier Brewing plant cannot be used as a warehouse because it is full of equipment and tanks. The tanks can only be removed *427 from the side of the building facing the freeway. To remove the tanks would require closing for the freeway. On its return for the taxable year ended June 30, 1974, petitioner took a deduction for an obsolescence loss which represented one-fourth of the basis after salvage value for the building and machinery at the Lucky Lager plant in San Francisco. Petitioner did not take deductions for the remaining obsolescence loss in the taxable years 1975 and 1976. On October 7, 1974, the General Brewing Corporation, one of petitioner's subsidiaries, entered into a production agreement with the Falstaff Brewing Corporation. Under the terms of the agreement, General Brewing Corporation would produce beer and ale for Falstaff and that production was to occur at General's plant in Vancouver and at the Lucky Lager plant in San Francisco. Production stopped at the Lucky Lager plant in February, 1978. The property was used as a warehouse for a few months more. The plant had been put up for sale, but no one has bought it since. Since the Lucky Lager plant closed in 1978, petitioner has received several inquiries regarding redevelopment of the property, but no one has offered to buy the property *428 and run it as a brewery. The plant cannot be used economically. In addition to the evidence relating specifically to the Maier and Lucky Lager breweries, other evidence was adduced regarding breweries in general. When prohibition was repealed, there were over 860 brewery plants in the United States. Most of those have gone out of business. Of all the plants that were closed, only one was reopened for a short period of time. A few large breweries have established very aggressive growth patterns and are growing at a rate far greater than the growth in beer consumption. They have built and are building modern, highly efficient plants that produce very fine beer with a high degree of market acceptability. Regional and local breweries that have not kept up with modern technology can no longer compete with these major breweries in price and quality. Between 1950 and 1984, 19 breweries in California went out of business. Only one of these plants was opened again, but it was closed again within a year. Brewing plants that operate in metropolitan areas now have transportation problems. They have difficulty in getting spur tracks, and it is difficult for their trucks to get in and *429 out of plant facilities. Labor costs are higher for older plants because more people are required to operate the older equipment. When old plants close, their equipment is of little value because it cannot be used in more modern plants. Many old plants cannot be used for warehouses because they are full of equipment. No closed brewery has been used for any significant commercial purpose. Anheuser Busch, Miller and Stroh have large modern plants in the outlying areas around Los Angeles. Anheuser Busch also has a large modern facility in Fairfield, about 45 miles north of San Francisco. There is no operating brewery in either central Los Angeles or central San Francisco. There is a steam beer "hobby" plant in central San Francisco that is losing considerable amounts of money. Section 167 allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, including a reasonable allowance for obsolescence, of property used in the trade or business. Respondent disallowed the deductions taken by petitioner for obsolescence of the Maier Brewing and Lucky Lager plants and maintains that petitioner has failed to prove that either plant was obsolete. Obsolescence *430 can shorten the useful life of an asset. Section 1.167(a)-1(b), Income Tax Regs., provides in part: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the *431 method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * * Section 1.167(a)-9, Income Tax Regs., provides: § 1.167(a)-9. Obsolescence. The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change *432 to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete at some later date. * * * The Supreme Court has described obsolescence as follows: Obsolescence may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value. [United States Cartridge Co. v. United States,284 U.S. 511, 516 (1932).] In Zimmerman v. Commissioner,67 T.C. 94, 106-107 (1976), we explained: [O]bsolescence is, in the first instance, the antithesis of depreciation for wear and tear, resting ultimately on disuse rather than use. * * * In effect it affords a taxpayer the opportunity to recover the cost of an asset if he sustains the burden of proving that depreciation deductions for wear and tear will be insufficient to restore to him the basis of the asset because the life thereof has been shortened by reason of its having been rendered inutile *433 for the function it once performed. * * * [Citations omitted.] To reduce the useful life of its plants, petitioner must show both that the properties were becoming obsolete in 1974 and that they would become obsolete. Zimmerman v. Commissioner, supra. It is not enough to show that the facilities were more costly to operate than newer models, that they were less profitable because competitors could produce a more advanced product, or that demand for petitioners' output has declined because these disadvantages by themselves do not establish that the obsolete facility will be retired from service sooner than depreciated. Obsolescence, in short, must diminish the asset's useful life; depreciation allowances cannot be increased simply because economic or technological changes have put petitioner at a competitive disadvantage. See 1 B. Bittker, Federal Taxation of Income, Estates and Gifts, 23.3.6 (1981). See also Zimmerman v. Commissioner, supra.
In Zimmerman, the taxpayer sought to shorten the useful lives of three motels and an antique car museum arguing that the declining neighborhood and the advent of the modern hotel significantly reduced his business rendering his motels and museum *434 obsolete. We allowed the deduction for one of his motels because the opening of new roads had diverted traffic away from the motel rendering it useless as a motel. We disallowed the deduction for the other two motels, explaining that the taxpayer had confused competition with obsolescence. We also disallowed the deduction for the car museum even though it was located next to the motel for which we had allowed the deduction because the taxpayer had failed to establish that the change in traffic patterns had rendered the car museum useless as a museum. Petitioner bears the burden of proving that in 1974 obsolescence reduced the useful life of the Maier Brewing plant in Los Angeles and the Lucky Lager plant in San Francisco. Section 1.167(b)-(0)(a), Income Tax Regs.; Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). In this case petitioner has not met its burden of proving that the Lucky Lager plant was becoming obsolete in 1974 but has met its burden of proving the obsolescence of the Maier Brewing plant. Petitioner's expert witness testified that both the Maier Brewing plant and the Lucky Lager plant in San Francisco were obsolete. However, the expert equated obsolescence with *435 unprofitability. The unprofitability of an asset is insufficient to establish obsolescence. Ames v. Commissioner,626 F.2d 693, 697 (9th Cir. 1980), affg. T.C. Memo. 1977-249. In fact, petitioner's expert indicated that a businessman might try to revitalize those breweries. The claim for a reduction in the useful life because of obsolescence must be based on conditions known to exist at the end of the taxable year. Sections 1.167(a)-1(b), 1.167(b)-0(a), Income Tax Regs. Although production at the Lucky Lager plant ceased in 1978, petitioner has not established that in 1974 the Lucky Lager plant was obsolete or was becoming obsolete, i.e., that it was or would soon be useless as a brewery. In 1974, petitioner signed a production agreement with Falstaff which specifically contemplated that the Lucky Lager plant would be used to meet Falstaff's requirements by producing beer and ale. In 1974, it appeared that the Lucky Lager plant was not only useful but necessary to meet Falstaff's production requirements. Accordingly, the deduction taken for obsolescence of the Lucky Lager plant in San Francisco is disallowed. Petitioner has met its burden of proving that the Maier Brewing plant *436 was useless as a brewery in 1974. Beer production at the plant had ceased in 1973, and operations there were discontinued in 1974. The plant was built in 1875, was falling apart, could not be dismantled without closing the Santa Ana Freeway, and could not be used for any other commercial purpose because it was full of equipment. Since the brewery was closed in 1975, there has been no offer to purchase the property. However, petitioner failed to claim the deductions with respect to the Maier Brewing plant in a way that can be allowed. In its 1974 income tax return, petitioner first took the normal depreciation of the Maier Brewing plant assets based on a nine-year useful life and then took an additional deduction equal to one-third of the remaining basis for obsolescence of the plant. Petitioner is not entitled to take both depreciation and obsolescence deductions for the same property in the same taxable year. Obsolescence is not a deduction allowable in addition to depreciation but is a possible additional element in the computation of depreciation. Red Wing Malting Co. v. Willcuts,15 F.2d 626 (8th Cir. 1926); Kaltenbach v. United States,66 Ct. Cl. 581, 587 (1929). After taking *437 an obsolescence deduction of one-third of the remaining basis of the Maier Brewing plant in 1974, petitioner deducted the rest of the basis over the next two years. On its returns for the taxable years 1975 and 1976, petitioner indicated that these deductions were based on a nine-year useful life. Respondent argues that the obsolescence deduction for the Maier Brewing plant should be disallowed for the taxable year 1974 because petitioner failed to claim obsolescence deductions in subsequent years. Petitioner maintains that it took obsolescence deductions in the subsequent years because it divided the remaining basis of the assets between the two subsequent years which were the two final years of the nine-year useful life originally claimed by petitioner. Petitioner has failed to understand the nature of the deduction based on obsolescence. Obsolescence increases the amount of depreciation allowable for an asset in a given tax year because it shortens the useful life of the asset. Section 1.167(a)-9, Income Tax Regs.
We find that the Maier Brewing plant was obsolete in 1974 and that obsolescence caused its useful life to end in 1974. Accordingly, petitioner must write off the *438 entire remaining basis of the Maier brewing plant in 1974, and the "depreciation" deductions taken in 1975 and 1976 for the plant are disallowed. [15]
Issue 5: Walter Brewing Company Depreciation
Petitioner purchased stock control of the Walter Brewing Company on December 1, 1971. Operations at the Walter Brewing Company plant ceased in December, 1974. On its return for the taxable year 1975, petitioner took a depreciation deduction for $ 134,993 worth of machinery and equipment at the plant. Respondent disallowed the deduction. Petitioner bears the burden of proof on this issue. Rule 142(a). Petitioner presented no documentary evidence to substantiate the deduction. The only evidence on this issue is Kalmanovitz's testimony that sometime after operations ceased, a fire burned down one of the buildings and that although a portion of the property was sold, no one wanted to buy the remainder as a brewery. In Kalmanovitz's opinion, the brewery had no value other than the value of the land minus demolition *439 costs. Kalmanovitz did not disclose when the fire occurred or whether it harmed the machinery and equipment at issue. Petitioner has failed to establish that the assets had a remaining basis of $ 134,993 or that they were retired from service, had become obsolete or were otherwise subject to depreciation. Accordingly, the deduction is disallowed. Issue 6: Bad Debt Reserve
In the taxable years 1963, 1964 and 1965, Maier Brewing Company increased its reserve for bad debts. During that time sales of beer to distributors had increased and sales to retailers had decreased. The retailers had maintained good credit to ensure the marketability of their liquor licenses. The distributors had no such concern. Petitioner maintains that the debt reserve was increased to protect the company's interest. Respondent disallowed the following amounts of the bad debt reserve of Maier Brewing Company for the years 1963, 1964 and 1965, respectively: $ 44,040.13, $ 17,315.60 and $ 6,640.96. Respondent disallowed $ 302,439.00 of the bad debt reserve of General Brewing Company, one of petitioner's subsidiaries, for the year 1976.
Section 166(c) as in effect during the years in issue provided that *440 in lieu of the deduction allowed for partially or wholly worthless debts, "there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." [16]
Section 1.166-4(b)(1), Income Tax Regs., provides: (b) Reasonableness of addition to reserve -- (1) Relevant Factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. *441 The commonly used formula for determining what constitutes a reasonable addition to a reserve for bad debts was set forth in Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. on other issues 125 F.2d 977 (6th Cir. 1942). The formula bases the addition on the arithmetic average of the taxpayer's total receivables and bad debt losses during the previous six years. The Black Motor formula is not the only test for determining the reasonableness of a reserve for bad debts. In Black Motor Co. v. Commissioner,41 B.T.A. at 304, the Board observed: The test, however, is whether the amount ultimately determined, regardless of formula, constitutes a reasonable addition to petitioner's reserve. What constitutes a reasonable addition will depend upon the facts and circumstances of the business engaged in with relation to general business conditions. * * * Section 166(b) places the determination of the reasonableness of the reserve in the discretion of the Commissioner. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 547 (1979). In order to prevail, the taxpayer must carry his burden of proof, Black Motor Co. v. Commissioner, supra;Rule 142(a), and that burden is a "heavy *442 burden" in this respect. Thor Power Tool Co. v. Commissioner, supra.The Commissioner will be overruled only where there is a clear showing of abuse of discretion. United States v. Haskel Engineering & Supply Co.,380 F.2d 786 (9th Cir. 1967). The taxpayer must show not only that its own computation is reasonable but also that the Commissioner's computation is unreasonable. Thor Power Tool Co. v. Commissioner,439 U.S. at 548. In this case petitioner has failed to meet its burden of proof. Kalmanovitz testified that when Maier Brewing Company began selling more beer to distributors, the company suffered significant losses. However, petitioner has not introduced into evidence any accounting data regarding the bad debt reserve. Without actual figures substantiating the expected losses, it is impossible to determine whether petitioner's computation was reasonable or respondent's computation was unreasonable. Accordingly, respondent's computation of the bad debt reserve must stand. Issue 7: The Cost of Moving Brewery Tanks
In 1959, Maier Brewing Company purchased all the assets of the Goebels plant in Oakland, California, from a bankruptcy trustee. In 1963, Maier signed a contract *443 with the Sheedy Transportation Company to move storage tanks from the Goebels plant in Oakland to the Maier plant in Los Angeles. On April 9, Maier issued a check in the amount of $ 20,633.45 to Sheedy for removal of the tanks. On its 1963 income tax return, petitioner deducted this amount as a general business expense. Respondent disallowed the deduction, taking the position that it should be capitalized. As a general rule "ordinary and necessary expenses" of a taxpayer's business are deductible under section 162. However, even if related to a business, such expenses are treated as capital expenditures when they are incurred in the acquisition of a capital asset. Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 577 (1980). Capital expenditures "are added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the asset is sold." Woodward v. Commissioner,397 U.S. 572, 574-575 (1970). The cost of acquisition of machinery and equipment having a useful life beyond one taxable year is a nondeductible capital expenditure. *444 Section 1.263(a)-2(a), Income Tax Regs.
The amount paid to Sheedy for moving the tanks from the Goebels plant to the Maier plant was part of the cost of acquiring the tanks and therefore was a nondeductible capital expenditure. See Sears Oil Co. v. Commissioner,T.C. Memo. 1965-39, affd. and revd. on other issues 359 F.2d 191 (2d Cir. 1966) (expenditures for towing barges from place of manufacture to taxpayer's place of business are additional outlays in the acquisition of the barges and therefore constitute addition to cost basis of the barges). Accordingly, the cost of moving the brewery tanks must be capitalized, and the deduction is disallowed. Petitioner relies on Addressograph-Multigraph Corp. v. Commissioner, a Memorandum Opinion of this Court dated Feb. 5, 1945; Alexander Sprunt & Son, Inc. v. Commissioner,24 B.T.A. 599 (1931), affd. in part, revd. in part on other issues 64 F.2d 424 (4th Cir. 1933); Eastern Shoe Manufacturing Co. v. Commissioner,8 B.T.A. 1169 (1927); and McAdam & Foster, Inc. v. Commissioner,8 B.T.A. 967 (1927), in which expenses incurred for moving machinery and equipment were allowed as ordinary and necessary business deductions under section 162. *445 In all of the cases upon which petitioner relies, the taxpayer moved from one of the taxpayer's business locations to another equipment and machinery that it owned and had been operating. In this case Kalmanovitz testified that he and Tom Grace of Santa Rosa Brewing had planned to form a partnership after Maier Brewing bought the assets of the Goebels plant, but that Grace changed his mind, and Maier Brewing "got stuck with all the assets." Petitioner has failed to produce any evidence to show that the tanks were ever placed in serve from the time they were purchased until the time they were shipped to Los Angeles. Therefore, we find that the tanks were warehoused at the Goebels plant during that period and that the expenses incurred in moving the tanks constitute part of the price of acquiring them. Issue 8: Martinique East Apartments: Accrual of Real Estate Tax and Interest Expense
On December 13, 1962, Regal Pale, one of petitioner's subsidiaries, purchased the Martinique East, a 69-unit apartment complex in Costa Mesa, California. Because of water seepage problems, petitioner filed a lawsuit in the Superior Court of Orange County to rescind the purchase. In March, 1964, a *446 receiver was appointed to administer the property. After that time petitioner did not pay the mortgage or property taxes. As of June 30, 1965, petitioner had accrued interest expenses of $ 80,684 and property taxes of $ 42,866 and had taken a depreciation expense deduction of $ 94,061 for the property. On October 5, 1965, all contingent liabilities were released, and the property were returned to the mortgagee through foreclosure. Respondent disallowed the following deductions taken for Regal Pale for the taxable year 1965: Accrued interest expense
$ 80,684.93 Accrued real estate taxes
42,866.80
Depreciation expense
94,061.94
TOTAL   $ 217,613.67
Along with its tax return for the taxable year 1966, petitioner filed Form 982, Consent of Taxpayer to Adjustment of Basis of Property under Section 1017 of the Internal Revenue Code. On the consent form, petitioner excluded from income under section 108(a) $ 203,922.41 and elected to have the basis of its depreciable property adjusted in accordance with the regulations prescribed under section 1017. Respondent included in the income of Regal Pale, for the taxable year 1966, the following items: Excessive interest expense accrued
$ 80,684.93 Unpaid accrued real property taxes
42,866.80
Recapture of excessive depreciation,
80,370.75
gain on foreclosure TOTAL ADJUSTMENT   $ 203,922.48
*447 Respondent argues that interest and taxes are not properly accruable because the all events test under section 461 has not been satisfied. [17] We agree. The all events test is met with respect to any item if all events have occurred which determine the fact of liability and if the amount of such liability can be determined with reasonable accuracy. Section 1.461-(a)(2), Income Tax Regs.; United States v. Anderson,269 U.S. 422 (1926). In the taxable year ended June 30, 1965, all events had not occurred to determine the fact of petitioner's *448 liability for the interest. At that time the validity of the sale to petitioner of the Martinique East Apartments was still in dispute, and, therefore, petitioner's liability for the mortgage payments and property taxes was also in dispute. A disputed liability cannot be deducted by an accrual method taxpayer until the claim is finally adjudicated. United States v. Consolidated Edison Co.,366 U.S. 380 (1961); [18] *449 Dixie Pine Products v. Commissioner,320 U.S. 516 (1944). See also section 1.461-1(a)(3)(ii), Income Tax Regs. Petitioner maintains that the interest and property taxes were not disputed liabilities. Petitioner bears the burden of proof on this issue. Rule 142(a). Section 1.461-2(b)(2), Income Tax Regs., provides that "[a] contest [which would prevent accrual of a liability under section 461 (a)] arises when there is a bona fide dispute as to the proper evaluation of the law or the facts necessary to determine the existence or correctness of an asserted liability." The suite for rescission of the sale of the property created a bona fide dispute *450 concerning petitioner's liability for the mortgage payments, which included the interest at issue in this case. Accordingly, the deduction for interest taken with respect to the Martinique East Apartments in the taxable year 1965 is disallowed. The appointment of the receiver for the Martinique East Apartments created a dispute as to petitioner's liability for the property taxes. Property taxes constitute one of the expenses of a receivership. Schreiber v. Ditch Road Investors,105 Cal. App. 3d 675, 164 Cal. Rptr. 633 (1980). It is within the discretion of the court to charge the receivership expenses against the property in receivership or to either of the parties exclusively or to allocate the expenses between them in equitable proportions. Murphy v. Cosentino,204 Cal. App. 2d 614, 22 Cal. Rptr. 441 (1962). Therefore, until the receivership ended, it was not possible to determine whether petitioner would be liable for any or part of the property taxes. Because this liability was in dispute in the taxable year ended June 30, 1965, the deduction for property taxes is disallowed. [19] *451 The depreciation claimed for the taxable year 1965 is allowed. Although a receiver had been appointed for the property, petitioner still retained sufficient benefits and burdens of ownership to satisfy the test in Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981), and to qualify as the owner of the property for purposes of depreciation. See Tressler v. Commissioner,T.C. Memo. 1953-111, affd. 228 F.2d 356 (9th Cir. 1955). However, in the taxable year 1966, the year of foreclosure, petitioner must realize additional gain on disposition of the property under section 1250 for the additional depreciation taken for the Martinique East Apartments in the taxable year ended June 30, 1965. On October 5, 1965, the dispute concerning the Martinique East Apartments was settled. At that time deductions for interest and taxes were allowable under the all events test. However, petitioner was released from liability for the interest and property taxes on the same date. The release from liability constituted income to petitioner from discharge of indebtedness under section 61(a)(12) and the doctrine of United States v. Kirby Lumber Co.,284 U.S. 1 (1931). *452 The allowable deductions offset the amounts includable in petitioner's gross income under section 61(a)(12). Accordingly, we disallow deductions for interest and property taxes for the Martinique East Apartments and hold that the amounts representing interest and property taxes are not included in petitioner's income for the taxable year ended June 30, 1966. Because we hold that the discharged indebtedness for interest and property taxes was not to be included in petitioner's gross income in the taxable year 1966, petitioner's election under section 108(a) to exclude this amount from gross income and to reduce the basis of its depreciable property under section 1017 was not necessary and is of no effect. Issue 9: The Lucky Lady
Enterprise Advertising Agency, a subsidiary of S & P, owns a 30-ton yacht known as "Lucky Lady" or "Miss Lucky." The yacht is approximately 87 feet long. The Lucky Lady was originally owned by Regal Pale Brewing Company which became part of S & P in 1968. The original basis of the yacht with S & P was $ 111,500. S & P made refurbishments that increased the basis to $ 276,111 at the time it was transferred to Enterprise Advertising Agency. The Lucky Lady *453 was an old PT boat that was completely stripped in 1974. Two small six-cylinder engines were removed and replaced by three 12-cylinder engines. Because the 12-cylinder engines weighed more than the six-cylinder engines, the foundations for the port and starboard engines were built up to support them. The engines and generators were repaired. Lights were rewired. Water tanks were removed and replaced with stainless steel fuel tanks. Carpeting was added. A new galley and furniture were installed. Many of the repairs were made in order to run the boat efficiently and to bring it up to Coast Guard standards. After the initial remodeling, the boat had to be maintained every year. The yearly maintenance including painting, cleaning and checking for dry rot. Kalmanovitz never used the yacht for personal pleasure unrelated to business. Kalmanovitz held business meetings on the yacht. The yacht was reflected in petitioner's corporate income tax return as "transportation equipment." Petitioner deducted $ 4,843, $ 71,555 and $ 32,664 for the taxable years 1974, 1975 and 1976, respectively, for repairs to the yacht and also took depreciation deductions for the yacht in the taxable years *454 1975 and 1976. Respondent disallowed all deductions taken for the Lucky Lady. Respondent contends that the amounts expended for repairs to the yacht should be capitalized, and that petitioner may not take depreciation deduction for the Lucky Lady because it failed to meet the substantiation requirements set forth in section 274. a. Cost of Repairs
Section 162 allows a deduction for ordinary and necessary business expenses. However, an ordinary and necessary business expense deduction is disallowed under section 263 if it was paid or incurred for permanent improvements or betterments made to increase the value of or for restoring property or in making good the exhaustion thereof. Nondeductible capital expenses include amounts paid or incurred for permanent improvements or betterments made to increase the value of or for restoring property or in making good the exhaustion thereof. Nondeductible capital expenses include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life of, property owned by the taxpayer or (2) to adapt property to a new or different use. Section 1.263(a)-1(b), Income Tax Regs.
The cost of incidental repairs to property *455 used in the trade or business is deductible, but the cost of repairs that increase the useful life of the property must be capitalized. Section 1.162-4, Income Tax Regs., provides: The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.
Whether an expenditure is an allowable deduction as a business expense or must be capitalized is a factual determination depending on the extent and permanency of the work accomplished by the expenditure. Falstaff Beer, Inc. v. Commissioner,322 F.2d 744 (5th Cir. 1963), affg. 37 T.C. 451 (1961). We conclude that the repairs *456 made to the yacht Lucky Lady must be capitalized. In 1974, the Lucky Lady, an old PT boat, was completely stripped. The two six-cylinder engines were replaced by three 12-cylinder engines for which foundations were built up. The engines and generators were repaired, lights were rewired, water tanks, were removed and replaced with stainless steel fuel tanks, carpeting was added, and a new galley and furniture were installed. These repairs and improvements added to the value of the ship and substantially prolonged its useful life. Accordingly, the deductions taken for repairs to the Lucky Lady are disallowed. Petitioner relies on Shore v. Commissioner,T.C. Memo. 1959-166, revd. on other issues 286 F.2d 742 (5th Cir. 1961), in which this Court held that amounts expended for the purchase and installation of two marine engines in a ship were deductible ordinary and necessary business expenses. In that case there was evidence that the crankshafts of the engines needed replacement; that the engines were two of only ten engines of that type that had ever been built by a Copenhagen firm; that the other eight were no longer in existence; that only the Copenhagen firm could make a crankshaft *457 for the engines and this would take 10 to 12 months; and that if new crankshafts had been purchased and installed, the cost would have been about the same as the cost incurred in purchasing the two replacement engines. There was also evidence that the ship operated about the same after the replacement engines were installed and that after the replacement engines were installed, the ship was of the same value as it had been before the necessity for any engine repair or replacement. In Shore, we held that under the special facts and circumstances of the case, the cost of the replacement engines was deductible. In this case, the Lucky Lady was completely stripped and refurbished. Petitioner has produced no evidence to show that the value of the ship was not enhanced by the repairs. Indeed, two small six-cylinder engines were replaced by three 12-cylinder engines that were so much larger than the original engines that foundations had to be built up to support them. The replacement engines in this case materially added to the value of the ship and appreciably prolonged its useful life. The expenditures for yearly maintenance, if necessary to maintain the boat in efficient operating condition, *458 should be deductible as expenses for incidental repairs. See, e.g., Trustee Property No. 4 v. Commissioner,21 B.T.A. 627 (1930) (cost of replacement of parts of a yacht damaged by dry rot deductible business expense). However, petitioner has not substantiated any amount that was spent for yearly maintenance of the boat. Petitioner bears the burden of proving that respondent's determination was incorrect. Rule 142(a). In this case there is a failure of sufficient proof to permit allocating part of the expenditures to the return of capital and part to income under section 1.162-4, Income Tax Regs. See also Murphy Oil Co. v. Burnet,55 F.2d 17 (9th Cir.), affd. 287 U.S. 299 (1932). Moreover, many of the expenditures made in the taxable years 1974, 1975 and 1976 for incidental repairs to the Lucky Lady were part of a general plan of rehabilitation of the ship. An expenditure made for an item that is part of a general plan of rehabilitation, modernization and improvement of the property must be capitalized, even though, standing alone, the item may appropriately be classified as one of repair. United States v. Wehrli,400 F.2d 686 (10th Cir. 1968); Stoeltzing v. Commissioner,266 F.2d 374 (3d Cir. 1959), *459 affg. T.C. Memo. 1958-111; Jones v. Commissioner,24 T.C. 563 (1955), affd. 242 F.2d 616 (5th Cir. 1957). b. Depreciation
Section 274 disallows any deduction otherwise allowable for any item with respect to a facility used in connection with an entertainment, amusement or recreation activity unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of the taxpayer's trade or business. Facilities used in connection with entertainment include a yacht. Section 1.274-2(e)(2)(i), Income Tax Regs. Depreciation is an expenditure with respect to a facility used in connection with entertainment. Section 1.274-2(e)(3)(i), Income Tax Regs.
Section 274(d) requires substantiation by the taxpayer and provides in part: No deduction shall be allowed -- * * * (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating *460 his own statement, (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * * Each element in section 274(d) must be established separately for each occasion of use. Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225 (1971). Section 1.274-5(b), Income Tax Regs., sets forth rules for substantiation. To substantiate an expenditure for entertainment in general, a taxpayer must prove the amount of the expenditure; the date of the entertainment; the address or location and designation of the type of entertainment; the business reason for the entertainment or nature of business benefit derived or expected to be derived as a result of the entertainment and the nature of any business discussion or activity; and the occupation or other information relating to the person or persons entertained, including name, title or other designation sufficient to establish business relationship *461 to the taxpayer. Section 1.274-5(b)(3), Income Tax Regs.
A taxpayer must substantiate each element of an expenditure by adequate records or by sufficient evidence corroborating his own statement. Section 1.274-5(c)(1), Income Tax Regs. If the taxpayer fails to produce adequate records to substantiate an element of an expenditure relating to an entertainment facility, he may establish that element by his own statement accompanied by other corroborative evidence. The taxpayer's statement must contain specific information in detail. Section 1.274-5(c)(3); Income Tax Regs. Section 1.274-5(c)(6)(iii)(b), Income Tax Regs., provides that "[if] a taxpayer fails to maintain adequate records concerning a facility which is likely to serve the personal purposes of the taxpayer, it shall be presumed that the use of such facility was primarily personal." These substantiation requirements must be met before a taxpayer may take depreciation deductions for a yacht. Nicholls, North, Buse Co. v. Commissioner, supra. The only evidence in the record to substantiate the business purpose of the yacht and its relation to petitioner's business was the testimony of Ronald Weibelt, the skipper of the *462 yacht, that he had observed business meetings on the yacht. Weibelt did not mention any specific dates on which specific individuals spent time on the yacht. Even if Weibelt's testimony was sufficient corroborating evidence, petitioner has failed to produce any detailed statement of its own to establish the business purpose of the Lucky Lady and the yacht's relation to the business. By neglecting to produce adequate records or a sufficiently detailed statement on this issue, petitioner has failed to satisfy the substantiation requirements of section 274. Petitioner contends that it need not meet the substantiation requirements of section 274 because respondent has conceded this issue. We disagree. Respondent initially determined that Kalmanovitz had received constructive dividends in 1975 and 1976 for his personal use of the yacht. At trial, respondent conceded the constructive dividends issue. Petitioner maintains that this concession was an admission by respondent that the yacht was used for business purposes. The resolution of the constructive dividends issue is not determinative of the resolution of the substantiation issue. Even if the yacht was used for business purposes *463 and a deduction for depreciation would otherwise be allowable under sections 162 and 167, the provisions of section 274 must also be met before the deduction will be allowed. Section 274(a)(1); Sanford v. Commissioner,50 T.C. 823, 826 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). Because petitioner has not met the substantiation requirements of section 274, the deductions taken for depreciation of the Lucky Lady are disallowed. Issue 10: Regal Pale Land
In the taxable year ended June 30, 1975, petitioner claimed a charitable contribution for certain real property known as the San Francisco Regal Pale property. This property, which included land and buildings, was purchased in 1962 for approximately $ 779,000. The property was depreciated for tax purposes down to the basis of the land, $ 200,000. Production of beer at the San Francisco Regal Pale brewery had ceased in 1963. Before 1974, the buildings had been demolished, the land had been cleared and the property was being held for sale. In 1974, the San Francisco Unified School District condemned the property so that it could be used as a school. The school district hired an independent appraiser who valued the land *464 at $ 750,000. Petitioner did not hire an independent appraiser but considered the land to have a $ 1,200,000 value. After protracted and arm's-length bargaining, the school district and petitioner agreed upon a condemnation price of $ 941,000. Title to the property passed in October, 1974. The Resolution of the Board of Directors for petitioner states that the Regal Pale property at issue was sold to the school district. In petitioner's Federal income tax return for the taxable year ended June 30, 1975, petitioner stated the following: Gift to the San Francisco Board of Education of the fee title
on October 30, 1974, to land in the City of San Francisco -- Fair market value by appraisal
$ 1,200,000.00
Severance Award
941,000.00
Contribution to the City of San Francisco
$ 259,000.00  Allowable to year ended June 30, 1975
[20] = 5% of $ 699,367.02 + 36,808.79 [sic] = 36,808.79
Carry forward to subsequent years
$ 22,191.21  Petitioner claimed contributions *465 of $ 36,808.79 and $ 93,849.21 for the taxable years 1975 and 1976 for what it deemed a bargain sale of land to the City of San Francisco in 1975. Section 170(c) allows deductions for contributions or gifts to states or political subdivisions thereof, but only if the contribution or gift is made exclusively for public purposes. A taxpayer who makes a bargain sale to an organization described in section 170(c) is typically entitled to a charitable contribution equal to the difference between the value of the property and the amount realized from the sale. Stark v. Commissioner,86 T.C. 243, 255-256 (1986). To be entitled to the deduction, however, the taxpayer must meet certain requirements. In Stark, we explained: Like any purported charitable contribution, however, a sale for less than full consideration results in a deduction under section 170 only if the statutory requirements are satisfied. In the present case, petitioner is entitled to a deduction only if she made the bargain sale "to or for the use of" the United States and "for exclusively public purposes." Sec. 170(c)(1). Whether these requirements are satisfied depends primarily upon the intent of the donor under a standard *466 similar to that articulated in Commissioner v. Duberstein,363 U.S. 278 (1960). Only where the taxpayer's actual motivation is to benefit the charitable organization and not himself or some other nonqualifying person is he entitled to a deduction. * * * The taxpayer who negotiates for the best terms he can obtain in a commercial transaction cannot subsequently claim a deduction based upon any excess value of the "contributed" property over the consideration received therefor. [Citations omitted. 86 T.C. at 256.] In this case petitioner has failed to demonstrate that it had the required donative intent. Although petitioner valued the Regal Pale property at $ 1,200,000, an independent appraiser valued it at $ 750,000. After protracted and arm's-length bargaining, the school district and petitioner agreed upon a condemnation price of $ 941,000. When Kalmanovitz was asked why he considered as a gift the difference between the value he had assigned to the property and the amount of the condemnation award, he explained, "When you don't get your price and they take it away, you lost that money. So they told me the proper way is you have to write it off because that's a gift to the *467 man who has the power to condemn it." The evidence does not permit a finding that petitioner displayed a "detached and disinterested generosity * * * out of affection, respect, admiration, charity or like impulses." Commissioner v. Duberstein,363 U.S. 278, 285 (1960). Petitioner argues that it did display the required donative intent in transferring the Regal Pale property to San Francisco because there was a voluntary transfer of the property for less than adequate consideration. Petitioner maintains that it received no economic benefit from the transaction except as a member of the general public. We disagree. Although Kalmanovitz valued the property at $ 1,200,000, the independent appraiser valued it as $ 750,000. After protracted and arm's-length bargaining, petitioner obtained a condemnation award of $ 941,000, which was $ 191,000 more than the appraised value of the land. Petitioner has failed to prove that it transferred the property for less than adequate consideration. Moreover, under the facts and circumstances surrounding the transaction at issue, we cannot say that the transfer was voluntary. Petitioner's reliance on Klopp v. Commissioner,T.C. Memo. 1960-185, *468 is misplaced. In Klopp, the United States instituted condemnation proceedings against the taxpayer's property for the purpose of establishing a Nike antiaircraft missile site. After condemnation proceedings had commenced, negotiations were undertaken looking to the sale of the property to the United States in lieu of condemnation. Upon failure of the parties to agree on its value, the taxpayer gave the property to the United States. In Klopp, there was no question that the donation of the property was a gift; the taxpayer gave the property voluntarily to the United States for no consideration. The only issue for determination in Klopp was one of valuation. In this case petitioner received $ 941,000 for its property. Because the amount received by petitioner in this case represented adequate consideration for the Regal Pale property, the transfer of the property did not constitute a gift or contribution under section 170. We have considered petitioner's other arguments on this issue and find them meritless. Accordingly, the deduction taken with respect to the Regal Pale property is disallowed. Issue 11: Depreciation of the Studio Village Shopping Center
On March 27, 1964, *469 petitioner purchased the Studio Village Shopping Center located in Culver City, California. The purchase price was $ 4,196,984. Petitioner assigned $ 680,000 of this amount to the basis of the land. [21] Respondent determined that depreciation claimed by petitioner during the taxable years 1964 through 1966, 1969, and 1974 through 1976 was overstated because an incorrect allocation to depreciable improvements was adopted when the Studio Village Shopping Center was acquired. Section 1.167(a)-5, Income Tax Regs., provides in part: § 1.167(a)-5. Apportionment of basis. In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion of the lump sum as the value *470 of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * * Petitioner bears the burden of proving that respondent's allocation was incorrect. Rule 142(a); Elliott v. Commissioner,40 T.C. 304 (1963). Petitioner's allocation of $ 680,000 to the basis of the land and the remainder of the purchase price to the depreciable buildings and improvements was based on the business judgment and experience of its president, Kalmanovitz. He testified that when the property was acquired he studied each of the leases for the shopping center and determined the respective values of the improvements and land from his knowledge of reasonable rental values. We find that this testimony is self-serving and conclusory. Petitioner has failed to produce objective evidence to establish the fair market value of either the depreciable improvements or the land as of the date that they were acquired. Accordingly, petitioner has failed to meet its burden of proving that respondent's determinations were incorrect. Issue 12: Depreciation of the Costa Mesa Apartment Complex
On December 13, 1962, petitioner's subsidiary, Regal Pale, purchased a 145-unit *471 apartment complex in Costa Mesa, California. In computing the allowable depreciation expense for the 145-unit complex, petitioner allocated the basis into many separate accounts. At the time of purchase, the ages of the buildings ranged from less than six months to 18 months. [22]
Respondent determined that the depreciation claimed with respect to the Costa Mesa Apartment complex was computed by using an erroneous cost method. Respondent's determination is presumptively correct. Rule 142(a). Petitioner has failed to produce any evidence to aid the Court in determining this issue. Therefore, respondent's determination must be upheld. Issue 13: Depreciation of Regal Rule Machinery and Subsequent Sale of a Portion Thereof
For the taxable year 1967, petitioner's subsidiary, Regal Pale, depreciated the machinery and equipment located in its brewhouse, bottling plant and warehouse down to a basis of $ 66,595. Respondent disallowed the depreciation of these Regal Pale assets *472 in the amount of $ 129,949.02 for the 1967 tax year for failure to recognize the salvage value of the equipment amounting to $ 195,440.22. Petitioner concedes respondent's determination of salvage value but continues to urge the other grounds of protest raised in the petition. As part of its tax return for the taxable year 1966, petitioner filed Form 982, Consent of Taxpayer to Adjustment of Basis of Property under Section 1017 of the Internal Revenue Code, in which it elected under section 108 to reduce its basis in depreciable property in accordance with the regulations prescribed under section 1017. Petitioner argues, and respondent has conceded, that if the election under section 108 is inapplicable, then the basis in the Regal Pale machinery and equipment must be increased for purposes of depreciation and calculating the amount of gain realized on the sale of the property. Because we have held that the election under section 108 is inapplicable, supra, the corresponding adjustments must be made. [23] *473 Issue 14: Depreciation of the Regal Pale Brewery Buildings
Petitioner's subsidiary, Regal Pale, claimed a depreciation deduction of $ 241,497.20 for the taxable year 1968 with respect to its brewery buildings. That amount represented the entire remaining basis in the buildings. Respondent disallowed $ 164,896.05 of the deduction for the taxable year 1968. During the taxable year 1969, Regal Pale was merged into petitioner. Respondent allowed a depreciation deduction to petitioner for that year with respect to the Regal Pale brewery buildings in the amount of $ 76,601.15. This left $ 88,294.90 as the remaining undepreciated basis of the *474 buildings at the close of the taxable year 1968. Although petitioner characterized the deduction as depreciation on its income tax return, it now argues that the $ 241,497.20 deducted was actually a claim of complete obsolescence of the brewery buildings during the taxable year 1968. Petitioner's expert testified that Regal Pale was an "old, old plant" that could not compete with modern breweries. Although we sympathize with petitioner's plight, it has confused obsolescence with competition, and the deduction cannot be allowed. AtlantaBiltmore Hotel Corp. v. Commissioner,349 F.2d 677 (5th Cir. 1965), affg. T.C. Memo. 1963-255; Zimmerman v. Commissioner,67 T.C. 94, 108 (1976). See also Ames v. Commissioner,626 F.2d 693, 697 (9th Cir. 1980), affg. T.C. Memo. 1977-249 (unprofitability of an asset is insufficient to establish obsolescence). The only other evidence presented on this issue is a bill dated November 18, 1964, in the amount of $ 2,890 for demolition work at the Regal Pale Warehouse. The evidence presented is insufficient to support petitioner's claim for obsolescence, and the deduction is disallowed. [24] *475 Issue 15: Regal Pale Organization Expense
Regal Pale was merged into petitioner in the taxable year 1969. In its income tax return for the taxable year 1974, petitioner deducted $ 7,400 as an organization expense. Respondent disallowed the deduction on the ground that petitioner failed to establish that it was an ordinary and necessary business expense or that it was a loss allowable under section 165. Petitioner now requests that it be permitted to deduct the $ 7,400 organizational expense in computing its taxable income for the taxable year 1969. Respondent maintains that section 248 controls, and therefore the organizational expenses are not deductible. Before 1954, a corporation's organizational expenditures could not be deducted when paid or incurred, but were instead treated as investments that could be deducted as a loss on dissolution or, in the unusual case of a corporation of limited duration, amortized over the life specified in its charter. 3 B. Bittker, Federal Taxation of Income, Estates and Gifts P90.2.4 *476 (1981). For the purpose of conforming "tax accounting more closely with general business accounting for these costs," Congress enacted section 248 in 1954 to permit corporations to elect to amortize organizational expenditures over a period of 60 months or more from the month in which the corporation begins business. S. Rept. No. 1622, 83d Cong., 2d Sess. 37 (1954).
Failing an election under section 248, organizational expenditures may be deducted on dissolution (except for a corporation of limited life) under the judicial rules developed before the enactment of section 248. 3 B. Bittker, Federal Taxation of Income, Estates and Gifts P90.2.4 (1981). In Kingsford Co. v. Commissioner,41 T.C. 646 (1964), we discussed the judicial rules developed before the enactment of section 248 concerning the deductibility of organizational expenses upon merger of one corporation into another. We explained: In cases involving the deductibility of organization expenses a distinction has been made between instances where there has been an ordinary liquidation followed by a surrender of the corporate charter and dissolution and instances where there has been a statutory merger or consolidation. *477 Malta Temple Association,16 B.T.A. 409 (1929); Pacific Coast Biscuit Co.,32 B.T.A. 39 (1935); Citizens Trust Co.,20 B.T.A. 392 (1930). In the former a loss deduction has been allowed on the theory that when complete liquidation and dissolution occurred a capital asset acquired at the time of organization (the corporate franchise) was lost. In the latter no loss deduction has been allowed because the surviving or merged corporation continues to receive the benefit of the organization expenditures. In order for there to be a statutory merger, the applicable State law dealing with corporate mergers must be adhered to. * * * [41 T.C. at 661.] In this case, there is nothing in the record to show that there was an ordinary liquidation followed by a surrender of the corporate charter and dissolution. Petitioner has filed its burden of proving that it is entitled to the deduction and that respondent's determination was incorrect. Therefore, the deduction is disallowed. Issue 16: Vernon Street Building Useful Life
Keller Street Development Company, a subsidiary of S & P, owned some improved property on Vernon Street and leased it to National Can Company. On July 10, 1973, a fire destroyed *478 the building. The building was completely rebuilt and reoccupied by June 26, 1974. Keller had depreciated the property in the year ended June 30, 1974, showing on the return the original cost basis of $ 224,843, reserve depreciation of $ 162,438, and a remaining basis of $ 62,405. Depreciation claimed for the taxable year 1974 was $ 8,915. The cost to rebuild the burned building, including insurance proceeds and contributions by National Can Company, totaled $ 457,907. National Can Company paid $ 96,030, leaving a balance of $ 361,877. Keller was reimbursed by fire insurance in the amount of $ 301,840. Bids for the rebuilding work showed that the complete back area was reworked, the entire building was raised six inches so that there would be a 30-foot clearance, and a complete sprinkler system was installed at an added cost of $ 51,000. The insurance company and National Can Company paid for all this work. Of the rebuilding costs, $ 218,870 was paid for steel construction, and $ 178,116 was paid for general contracting. On its consolidated return for the taxable year ended June 30, 1974, petitioner began writing off the remaining basis of the property over a seven-year life. *479 The basis was not modified for additions to the property. [25]
Respondent determined that after its reconstruction the Vernon Street building had a remaining useful life of 15 years rather than seven years and recomputed petitioner's depreciation accordingly. Petitioner bears the burden of proving that respondent's determination was incorrect. Rule 142(a). Petitioner argues that respondent incorrectly extended the useful life beyond seven years. Petitioner maintains that although extensive repairs made to the building may have increased its physical life, there is no reason to assume that the repairs extended the economic useful life of the building. The Supreme Court has pointed out that the useful life of an asset is not necessarily its physical life but rather "the number of years the asset is expected to function profitaby in use." Massey Motors, Inc. v. United States,364 U.S. 92, 96 (1960). Petitioner, however, has failed to produce any evidence to show that the economic useful life of the building was not *480 increased by the extensive repair work and therefore has failed to meet its burden of proving that respondent's determination was incorrect. Because the cost of the repair work was paid by third parties, the repairs did not increase petitioner's basis in the property. Petitioner maintains that it should continue to recover its remaining basis over the same depreciation period that was used before the fire because its basis was not increased. The amount of petitioner's basis is irrelevant to the determination of the useful life of the property. The factors that determine basis have nothing to do with the factors that determine the useful life of a building. Basis is computed in terms of the cost of the property to the taxpayer, section 1012, whereas useful life depends on such factors as those set forth in sections 1.167(a)-1(b) and 1.167(a)-9, Income Tax Regs.
Petitioner's reliance on Hunter v. Commissioner, a Memorandum Opinion of this Court dated Mar. 26, 1951, is misplaced. In Hunter, the cost of repairs to a building partially destroyed by fire was paid almost entirely by insurance proceeds. Payment by insurance proceeds, however, was irrelevant to the determination of the *481 useful life of the building in Hunter because we found, as an independent fact, that the useful life of the building was not greater after the repairs than its useful life had been before the fire. In this case petitioner has failed to prove that the useful life of the Vernon Street building was no greater after the repairs than its useful life had been before the fire. We have held that the useful life of a building was extended by repairs performed after the building was substantially destroyed by fire even though the cost of the repairs was paid by insurance proceeds. See, e.g., Estate of Randolph v. Commissioner,T.C. Memo. 1970-324. Respondent's determination in this case must stand. Issue 17: S & P Abandonment Loss Deductions
Respondent disallowed $ 164,042 of the abandonment losses petitioner claimed for the taxable year 1976. Respondent maintains that petitioner did not establish that assets from the Lucky Lager Brewery in San Francisco were abandoned or that the bottle rinser 367 C was abandoned by the Vancouver plant during the year. Petitioner maintains that respondent's determination was incorrect, relying on facts which appear in respondent's Engineering and Valuation *482 Report. This document has been excluded from the record for the reasons set forth in note 6, supra. The only evidence presented by petitioner on this issue is the testimony of Paul Kalmanovitz that the bottle rinser "went out with shoe buttons" and that petitioner gave it away to a small San Francisco brewery, Anchor Steam. Petitioner has presented no evidence to establish when the alleged abandonment took place. Accordingly, petitioner has failed its burden of proving that respondent's determination is incorrect, and the deduction is disallowed. Issue 18: Capitalization of Salaries and Other Expenses in Connection with Acquisition of Falstaff Stock
Respondent disallowed certain deductions taken by petitioner for the taxable years 1975 and 1976 for officers' salaries because they were incurred in connection with the acquisition of stock of the Falstaff Brewing Corporation. Expenses incurred in acquiring stock are nondeductible capital expenditures under section 263. Woodward v. Commissioner,397 U.S. 572 (1970); United States v. Hilton Hotels,397 U.S. 580 (1970); Ellis Banking Corp. v. Commissioner,688 F.2d 1376 (11th Cir. 1982), cert. denied 463 U.S. 1207 (1983). Petitioner's *483 entire argument is directed at information contained in respondent's RAR. For the reasons set forth in note 6, supra, this document has been excluded from the record in this case. Petitioner has failed to meet its burden of proving that respondent's determination was incorrect, and the deductions are disallowed. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: S & P Company and Subsidiaries, docket No. 6937-82; and Paul Kalmanovitz and Lydia Kalmanovitz, docket No. 7163-82. ↩
2. S & P Company is the successor to Maier Brewing Company. The term "petitioner" refers to the corporation under either name. ↩
3. Since the date of trial, Paul Kalmanovitz has died. As of the filing date of this opinion, no substitution of parties has been effected. See Rule 63(a). Except as otherwise noted, all rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. All the issues in docket No. 7163-82 have been resolved through settlement, and therefore, we need not decide any issues in that case. ↩
5. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue. ↩
6. On March 27, 1982, we denied petitioners' Motion to Reopen the Record for Purpose of Including Respondent's Statutory Notices, RARS and Engineering and Valuation Report for the Years in Issue. On brief petitioners request our reconsideration of their motion. We adhere to our original decision. Respondent's statutory notices were attached to the petitions and are already part of the record. See Rule 34(b)(8). Therefore, we need not reopen the record to include the statutory notices. Respondent's RARS (Revenue Agent Reports) and Engineering and Valuation Report are administrative documents relating to the audit of petitioners' Federal income tax returns. As we stated in Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327-328 (1974): As a general rule, this Court will not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making his determinations. * * * The underlying rationale for the foregoing is the fact that a trial before the Tax Court is a proceeding de novo; our determination as to a petitioner's tax liability must be based on the merits of the case and not any previous record developed at the administrative level. [Citations omitted.] Respondent's RARS and Engineering and Valuation Report are not relevant to the determination of this case and therefore are not admissible. Fed.R.Evid. 402↩. 7. Keller Street Development Co. v. Commissioner,T.C. Memo. 1978-350, affd. 688 F.2d 675 (9th Cir. 1982), concerned the tax treatment of the $ 2,432,175.45 paid by Maier to Keller in compliance with a June 3, 1968, judgment of the California Superior Court. This case concerns the tax treatment of Maier of the same award. In Keller Street,↩ respondent's attempt to consolidate the two cases was met with staunch resistance by the taxpayers, and respondent's motion to consolidate was denied. 8. Ultimately, it was determined that the total purchase price payable under the terms of the purchase and sale contract was $ 7,761,193.49 instead of $ 7,708,605.25. ↩
9. Section 1341 as in effect during the years in issue provided in part: SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT. (a) GENERAL RULE. -- If -- (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer held an unrestricted right to such item; (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and (3) the amount of such deduction exceeds $ 3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following: (4) the tax for the taxable year computed with such deduction; or (5) an amount equal to -- (A) the tax for the taxable year computed without such deduction, minus (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years). For purposes of paragraph (5)(B), the corresponding provisions of the Internal Revenue Code of 1939 shall be chapter 1 of such Code (other than subchapter E, relating to self-employment income) and subchapter E of chapter 2 of such code. (b) SPECIAL RULES. -- (1) If the decrease in tax ascertained under subsection (a)(5)(B) exceeds the tax imposed by this chapter for the taxable year (computed without the deduction) such excess shall be considered to be a payment of tax on the last day prescribed by law for the payment of tax for the taxable year, and shall be refunded or credited in the same manner as if it were an overpayment for such taxable year. (2) Subsection (a) does not apply to any deduction allowable with respect to an item which was included in gross income by reason of the sale or other disposition of stock in trade of the taxpayer (or other property of a kind which would properly have been included in the inventory of the taxpayer if on hand at the close of the prior taxable year) or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. This paragraph shall not apply if the deduction arises out of refunds or repayments with respect to rates made by a regulated public utility (as defined in section 7701(a)(33) without regard to the limitation contained in the last two sentences thereof) if such refunds or repayments are required to be made by the Government, political subdivision, agency, or instrumentality referred to in such section, or by an order of a court, or are made in settlement of litigation or under threat or imminence of litigation. * * * (3) If the tax imposed by this chapter for the taxable year is the amount determined under subsection (a)(5), then the deduction referred to in subsection (a)(2) shall not be taken into account for any purpose of this subtitle other than this section. (4) For purposes of determining whether paragraph (4) or paragraph (5) of subsection (a) applies -- (A) in any case where the deduction referred to in paragraph (4) of subsection (a) results in a net operating loss, such loss shall, for purposes of computing the tax for the taxable year under such paragraph (4), be carried back to the same extent and in the same manner as it provided under section 172; and (B) in any case where the exclusion referred to in paragraph (5)(B) of subsection (a) results in a net operating loss or capital loss for the prior taxable year (or years), such loss shall, for purposes of computing the decrease in tax for the prior taxable year (or years) under such paragraph (5)(B), be carried back and carried over to the same extent and in the same manner as is provided under section 172 or section 1212, except that no carryover beyond the taxable year shall be taken into account. (5) For purposes of this chapter, the net operating loss described in paragraph (4)(A) of this subsection, or the net operating loss or capital loss described in paragraph (4)(B) of this subsection, as the case may be, shall (after the application of paragraph (4) or (5)(B) of subsection (a) for the taxable year) be taken into account under section 172 or 1212 for taxable years after the taxable year to the same extent and in the same manner as -- (A) a net operating loss sustained for the taxable year, if paragraph (4) of subsection (a) applied, or (B) a net operating loss or capital loss sustained for the prior taxable year (or years), if paragraph (5)(B) of subsection (a) applied. ↩
10. Because we have held that the award to Keller was not an item of income included in petitioner's gross income during the years in issue, we need not address the other arguments raised by both parties regarding the applicability of section 1341↩. 11. Section 167, as in effect during the years in issue, provided in pertinent part: DEPRECIATION Sec. 167 [1954 Code]. (a) GENERAL RULE. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in a trade or business, or (2) of property held for the production of income. Section 168 provides an accelerated cost recovery system by shortening the useful life of property used in a trade or business or held for the production of income. The accelerated depreciation provided in that section cannot help petitioner in this case because section 168 applies to property placed in service after December 30, 1980. Section 168(e)(1). The May Company building was placed in service in 1967. Section 168 was amended by the Tax Reform Act of 1986. Pub. L. 99-514, 100 Stat. 2085. The new amendments do not apply in this case because they apply to property placed in service after December 31, 1986. Section 203(a)(1), Pub. L. 99-514, 100 Stat. 2085, 2143 (1986). 12. Respondent has objected to the admission of this document into evidence. Respondent has stipulated, however, that the document is authentic and has admitted that it was used in petitioner's business. Accordingly, we admit into evidence the letter under the business records exception to the hearsay rule under Fed.R.Evid. 803(b)↩. 13. From 1974 until 1978, this beer was produced at General's Lucky Lager plant in San Francisco and at its plant in Vancouver. After the Lucky Lager plant closed in 1978, all the production occurred at the Vancouver plant. ↩
14. Respondent also argues that petitioner incorrectly allocated the purchase price of the Falstaff plant between land and buildings for purposes of computing depreciation. Because we hold that the brewery assets did not qualify for depreciation deductions at all, we need not address this issue. ↩
15. Because we hold that petitioner may claim a deduction for the obsolescence of the Maier Brewing plant in 1974, we need not address petitioner's other arguments on this issue. ↩
16. In 1976, Congress amended section 166 by substituting "Secretary" for "Secretary or his delegate." Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520. Section 166(c)↩ has been repealed for the taxable years beginning after December 31, 1986. Section 805, Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2361. 17. Section 91 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 598, added section 461(h) which provides a third requirement to the all events test. Under section 461(h), "the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." Section 461(h) does not apply to this case because its economic performance requirement applies to deductions that would have been allowable (without respect to this requirement) after July 18, 1984. Section 1.461-3T, Temporary Income Tax Regs., 50 Fed. Reg. 20748↩ (May 20, 1985). In this case the deductions were taken in the taxable year 1965. 18. In United States v. Consolidated Edison Co.,366 U.S. 380 (1961), an accrual method taxpayer had paid under protest the disputed amount of state property taxes while it contested its liability for this payment in state court. The Supreme Court held that even though the taxpayer had actually remitted cash in payment of the disputed amount, it was not entitled to deduct the property taxes until its liability was finally determined by the state court. In 1964, Congress softened the impact of United States v. Consolidated Edison Co., supra, by enacting section 461(f), which permits a contested liability to be deducted if money or other property is transferred "to provide for the satisfaction of the asserted liability," provided a deduction would be allowed for that year or an earlier year but for the contest. Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 19. See S. Rept. No. 830, 88th Cong., 2d Sess. (1964), reprinted in 1964-1 C.B. (Part 2) 502, 604. Nevertheless, the rule enunciated in Dixie Pine Products v. Commissioner,320 U.S. 516 (1944), remains for taxpayers who do not pay the disputed liability. See section 1.461-1(a)(3)(ii), Income Tax Regs. Because petitioner did not pay the interest or property taxes at issue in this case, it cannot take advantage of the exception carved out in section 461(f)↩. 19. Because we hold that the interest payments and property taxes were not properly accruable, we need not address respondent's other arguments on this issue. 20. These are the figures as they appeared on petitioner's Federal income tax return. To arrive at the amount intended by petitioner, this line should read as follows:
Allowable to year ended June 30, 1975 = 5% of $ 699.367.02 + $ 1,840.35 = 36,808.79 ↩
21. Petitioner proposes that this Court find additional facts that are included in respondent's RARs and valuation report. We have already explained why these documents cannot be included in the record. See note 6, supra.↩ Without any evidence in the record to support petitioner's proposed findings of fact, we decline to make such findings. 22. Petitioner proposes that we find additional facts based on respondent's RARs which have not been included in the record. For the reasons set forth in notes 6 and 21, supra,↩ we decline to make these findings. 23. Petitioner claimed a loss in income in the amount of $ 558,747.93 for the taxable year 1967, and respondent determined that petitioner's loss was only $ 3,233.12 for that year. Because no deficiency was determined that year, the 1967 taxable year is not before us. Nevertheless, we must determine this issue because the amount of loss allowed in 1967 affects the amount of taxes of other years in issue in this case. Although we do not have jurisdiction to determine whether petitioner underpaid or overpaid the tax for the 1967 taxable year, we must consider facts with relation to the tax for 1967 that are necessary to determine whether the taxes for the years before us have been overpaid or underpaid. Section 6214(b). 24. Most of petitioner's argument on this issue is directed toward information contained in the RARs which are not part of the record in this case. For the reasons set forth in note 6, supra,↩ we decline to address these arguments. 25. Petitioner proposes that we find additional facts set forth in respondent's RARs. For the reasons set forth in notes 6 and 21, supra,↩ we decline to find these facts.